UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gregory S. Klingelhut,

    Plaintiff,

v.

Bruce Anderson, individually and in his official
capacity as Sherburne County Sheriff; Brian Frank,
individually and in his official capacity as a Captain
of the Sherburne County Sheriff's Department; John
Olson, individually and in his official capacity as a
Sergeant of the Sherburne County Sheriff's Department;
Julia Sorenson, Nathan Johnson, Angela Loscheider, and
Marie Ebert, individually and in their official capacities
as Correctional Officers of the Sherburne County Sheriff's
Department; Michael Paul, individually and in his official
capacity as an employee of the Sherburne County Sheriff's
Department; John Doe in his individual and official
capacity; and Sherburne County,

    Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 05-171 ADM/JSM

---

Andrew J. Noel, Esq., and Robert Bennett, Esq., Flynn, Gaskins & Bennett, L.L.P., Minneapolis, MN, appeared for and on behalf of Plaintiff.

Jason M. Hiveley, Esq., Iverson Reuvers, LLC, Bloomington, MN, appeared for and on behalf of Defendants.

---

## I. INTRODUCTION

On May 31, 2006, oral argument before the undersigned United States District Judge was heard on the Motion for Summary Judgment [Docket No. 19] of all Defendants. In his Complaint [Docket No. 1], Plaintiff Gregory S. Klingelhut ("Klingelhut" or "Plaintiff") alleges

1

Defendants violated his constitutional rights by disregarding a substantial risk of harm and denying him appropriate medical treatment.[1] For the reasons set forth below, Defendants' Motion is granted.

## II. BACKGROUND[2]

On January 20, 2004, Plaintiff Klingelhut began a 180 day sentence at the Sherburne County Jail for driving without a license. Klingelhut Dep. (Hiveley Aff. [Docket No. 22] Ex. 4) at 12-14. Klingelhut's first three days were spent in an intake room called the "bubble," followed by a transfer into the Delta North Unit ("Delta North"). Id. at 14-15. Inmates in the "bubble" are visible to those in Delta North through window panels. After being transferred to Delta North, Klingelhut met Barry Page ("Page"), a fellow inmate. Id. at 34. Shortly thereafter, Klingelhut alleges he heard younger inmates complain that Page made sexual propositions to them. Id. at 35. In response, Klingelhut confronted Page and told him he "didn't agree with what he was doing [because] it wasn't right." Id. at 36. During his time in Delta North, Klingelhut spoke about Page to other individuals, telling guards that he was "sick of this black ass nigger" and "sick of that fast ass nigger giving me a bad time." Id. at 62. Former Defendant Nathan Johnson ("Johnson") recalls Klingelhut asking to be moved on February 3, 2004, because Klingelhut was having problems with the "tall ass faggot," although Klingelhut would not identify to whom he was referring. Johnson Dep. (Hiveley Aff. Ex. 5) at 7-9. Johnson did

---

[1] Based on evidence revealed in discovery, Plaintiff Klingelhut has abandoned his claims against Nathan Johnson, Michael Paul, Bruce Anderson, and Sherburne County. Furthermore, Plaintiff is not pursuing his denial of medical treatment claim.

[2] For purposes of the instant Motion, the facts are viewed in the light most favorable to Plaintiff, the nonmovant. See Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

notify his superior of Klingelhut's request, and as a result, Klingelhut was moved that day from Delta North to the Gamma Unit ("Gamma"). Id. In his deposition testimony, Klingelhut stated that during January, Page "didn't threaten me." Klingelhut Dep. at 37. Klingelhut states he requested to be transferred from Delta North to Gamma because his cellmate continually asked him for money. Id. at 16-17. He admits he had a friend in Gamma, but did not ask to be transferred for this reason because he knew it was not a valid reason for transfer. Id. at 31-33.

On April 10, 2004, Klingelhut requested that he be moved from Gamma. Id. at 19. On that day, Klingelhut approached a guard and told the guard he wished to be moved because his cellmate was acting strangely and never left the cell. Id. When the guard denied Klingelhut's request, Klingelhut called the guard a "punk" and stated that they would "probably get into it." Id. at 20-22. Consequently, Klingelhut was placed in segregation for 7 to 15 days. Id. After being released from segregation, Klingelhut was placed in the "bubble" for three days. Id. at 24. During this transition period, Klingelhut alleges Page made threatening gestures towards him from Delta North, ostensibly because Page was still upset about the comments Klingelhut had previously made to and about Page. Id. at 39. Klingelhut, however, did not report these threats to the jail staff. Id. at 40.

On April 27, 2004, Klingelhut was again housed in Delta North. Id. at 30. Klingelhut immediately began having difficulties with Page. Id. at 47. Klingelhut alleges Page told him when no one else was around to "keep it up and I'm going to fuck you up." Id. at 48-49. On the same day he was moved to Delta North, Klingelhut began asking Defendant Angela Loscheider ("Loscheider") to be transferred, and reported Page's threat to her. Loscheider Dep. (Hiveley

3

Aff. Ex. 6) at 9-10.  Loscheider denied Klingelhut's transfer request, and told Klingelhut to stay away from Page.  Id.  She estimates that Klingelhut asked her between ten and fifteen times that day to be transferred.  Id. at 11.  Loscheider repeated her directive to Klingelhut to stay away from Page, and kept an eye on both inmates that day.  Id. at 15.  She discounted Klingelhut's report of a threat, however, because Klingelhut requested to be moved numerous times before reporting to her that he was threatened by Page, and he didn't report the threat until hours after it allegedly occurred.  Id. at 17.  Moreover, Loscheider observed both Klingelhut and Page in the day room the majority of the day, and saw no interaction between them.  Id. at 25.

The following day, April 28, 2004, Klingelhut claims he asked Defendant John Olson ("Olson") to transfer him from Delta North, repeating the threat Page made to him the previous day.  Klingelhut Dep. at 51.  Olson denied the request.  Id.  Defendant Marie Ebert ("Ebert") was also approached by Klingelhut on April 28, 2004 regarding a transfer, although he did not mention to her any threats by Page.  Ebert Dep. (Hiveley Aff. Ex. 8) at 9, 12-13.  Although Klingelhut testified he likely told his cellmate, Miguel Neumiller ("Neumiller"), about Page's threat, his cellmate denied any such conversation.  Klingelhut Dep. at 55; Neumiller Dep. (Hiveley Aff. Ex. 9) at 7, 9.  Neumiller relates in the interactions he observed between Klingelhut and Page, Klingelhut taunted Page.  Neumiller Dep. at 10-11.

On April 30, 2004, Klingelhut and the other inmates of Delta North were released from a 23 hour lockdown at 4:00 p.m.  Klingelhut Dep. at 53, 60.  Following the lockdown, Klingelhut and many of the inmates gathered in the day room of Delta North.  Klingelhut Dep. at 57-60.[3]

---

[3] The next set of incidents was captured by a security camera at the Sherburne County Jail. Sorenson Dep. (Hiveley Aff. Ex. 10) Ex. 4.  Although the video does not contain audio, it shows the incident in question.  All time references refer to the time appearing on the security video.

4

Klingelhut began a game of chess with another inmate at a table approximately fifteen feet from the station of the on duty corrections officer, Defendant Julie Sorenson ("Sorenson"). Id. at 57, 59. Page was standing at the station collecting his canteen items from Sorenson. Id. at 58. Klingelhut testified that at 4:10 p.m., Page said to him "you better quit talking to me." Id. at 61. Another inmate sitting next to Klingelhut responded that Klingelhut had not been talking to Page. Id. at 61. At the same time, another inmate seated at Klingelhut's table called Page a "fag." Id. at 65. A few seconds later, Page left the day room. Id. at 67. Klingelhut avers that on his way out of the room, Page said to him "I am going to fucking knock you the fuck out." Id. at 71. Klingelhut did not report the incident to Sorenson or return to his cell and lock himself in, believing the incident was over. Id. at 70, 72. Page stated that he was speaking in a voice low enough that Sorenson could not hear him. Page Dep. (Hiveley Aff. Ex. 11) at 42. About one minute later, at 4:11 p.m., Page reentered the room and moved an empty chair at Klingelhut's table. Klingelhut Dep. at 72. Although Klingelhut claims that Page again threatened him, he did not report the threat to Sorenson. Id. at 73. Page returned to the correction officer's station and continued to collect his canteen items. Id. at 74. At 4:12 p.m., Page picked up his canteen items in a sack and walked past Klingelhut's table. Id. at 76. Page stated "I got you," then immediately dropped the bag of items and assaulted Klingelhut. Id. Page testified that the assault was not premeditated, and he did not make up his mind to strike Klingelhut until he was standing next to him. Page Dep. at 107.

During the minutes preceding the assault, Sorenson was dispersing canteen items to various inmates. Sorenson Dep. at 17. When Klingelhut came into the day room, he told

5

Sorenson that "somebody needs to get that nigger faggot out of here" before somebody assaults him, referring to Page. Id. at 14-15, Ex. 3. Klingelhut did not indicate, however, that he personally had an issue with Page. Id. at 15-16. Sorenson told Klingelhut that she could not move an inmate simply because he did not get along with other inmates. Id. at 16-17, Ex. 3. Sorenson did not hear Klingelhut's conversation with Page in the day room, where many people were talking. Id. at 18-19. Immediately prior to and during the assault, Sorenson can be observed on the telephone. Id. at Ex. 4. Neumiller confirmed that prior to the assault, Sorenson was occupied with handing out canteen items to various inmates. Neumiller Dep. at 13-14. When Sorenson heard the commotion of the assault, she immediately called a "code red." Sorenson Dep. Ex. 2. In less than half a minute, numerous officers entered the unit to attend to Klingelhut's injuries and place Page in custody. Id.

### III. DISCUSSION

**A.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party

may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.    42 U.S.C. § 1983**

Defendants move for summary judgment on Plaintiff's 42 U.S.C. § 1983 claim. "Section 1983 imposes liability for certain actions taken 'under color of' law that deprive a person 'of a right secured by the Constitution and laws of the United States.'" Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005), quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982). Plaintiff has alleged violations of the Eighth and Fourteenth Amendments. However, as Klingelhut was a convicted inmate at the time of the alleged assault, the Eighth Amendment provides the appropriate standard. Crow v. Montgomery, 403 F.3d 598, 601-02 (8th Cir. 2005).

"Under the doctrine of qualified immunity, state actors are protected from civil liability when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sexton v. Martin, 210 F.3d 905, 909 (8th Cir. 2000), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To establish immunity, a constitutional violation must be demonstrated. Id. Second, it must be determined whether the constitutional right was "clearly established" at the time of the alleged violation. Id.

It is well established that prison officials have a duty to protect inmates from violence at the hands of other inmates. Farmer v. Brennan, 511 U.S. 825, 833-34 (1994). A constitutional claim that an inmate's Eighth Amendment rights were violated invokes a two part inquiry. The first, objective portion of the test requires a showing that the prisoner was "incarcerated under

7

conditions posing a substantial risk of serious harm." Id. at 834.  The second, subjective portion of the test requires a demonstration of "deliberate indifference" by prison officials to the risk of harm.  Id.  Deliberate indifference only exists where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  The Eighth Circuit has held that prison officials are due "wide-ranging deference . . . to preserve internal order and discipline and to maintain institutional security." Jackson v. Everett, 140 F.3d 1149, 1152-53 (8th Cir. 1998).  Moreover, mere negligence is insufficient to establish liability in this context; the prison official's behavior must be reckless. Id.

In factually analogous situations, the Eighth Circuit has found qualified immunity to apply to prison officials.  In Prater v. Dahm, the plaintiff inmate reported threats from another inmate to prison officials.  89 F.3d 538, 540 (8th Cir. 1996).  After briefly discussing the situation with the inmate who made the threats, the defendant prison officials determined that there was no danger to plaintiff.  Id.  Two weeks later, however, the plaintiff was assaulted by the threatening inmate.  Id.  In determining whether qualified immunity applied to the defendants, the Eighth Circuit assumed, without deciding, that the objective prong of the Eighth Amendment analysis was met.  Id. at 541.  In analyzing the subjective prong of the Eighth Amendment test, the Eighth Circuit held that despite the previous threat to plaintiff, the defendants did not have reason to believe there was a real danger to plaintiff, stating: "As an initial matter, [plaintiff] has alleged no facts from which an inference could be made that the

prison officials actually knew of the risk to [plaintiff]. Although [plaintiff's] pleadings allege that he was threatened by Penn, threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." Id.

Similarly, in Pagels v. Morrison, the Eighth Circuit granted qualified immunity to prison officials accused of failing to prevent an assault on an inmate. 335 F.3d 736, 738 (8th Cir. 2003). In Pagels, the plaintiff was housed in protective custody due to previous threats from inmates. Id. Plaintiff had informed prison officials that the perpetrators wanted to "fuck me up." Id. at 739. As in Prater, the Eighth Circuit assumed, without deciding, that the objective portion of the Eighth Amendment test had been met. Id. at 740. However, the Eighth Circuit held that the plaintiff could not satisfy the subjective portion of the test. Id. at 740-42. In so holding, it found that the letter received by defendants discussing the threat to the plaintiff was not sufficient to demonstrate that the defendants had actual knowledge of a threat of serious harm to the plaintiff. Id. at 740.

The facts of the instant case are similar to those presented in Prater and Pagels, and are insufficient to demonstrate an Eighth Amendment violation. Even assuming the objective component of the test is met, Plaintiff can not demonstrate that the subjective component of the test is met. Although Klingelhut had controversy with Page during his first stint in Delta North in January 2004, he does not allege he was threatened by Page at that time. Klingelhut Dep. at 37. Klingelhut stated that the first threatening behavior from Page occurred when he was in the bubble, shortly before being placed in Delta North in late April 2004. Id. at 39. However, Klingelhut did not report the alleged threatening gestures made by Page to any prison official.

9

Id. at 40.  Klingelhut claims a verbal threat on April 27, 2004, when he returned to Delta North. Id. at 48-49.  Klingelhut reported this threat on that same day to Defendant Loscheider. Loscheider Dep. at 9-10.  Although Loscheider denied Klingelhut's request to be transferred, she instructed him to stay away from Page, and kept an eye on both inmates throughout the day.  Id. at 15.  Loscheider did not perceive a substantial risk posed to Plaintiff because he requested to be moved from the Delta North unit a number of times on that same day before he mentioned the threat.  Id. at 17.  Additionally, Loscheider believed that many inmates cited threats as a reason to justify transfer.  Id.  Finally, although Klingelhut and Page were in the day room together much of the day, she observed no trouble between them.  Id. at 25.

Klingelhut reported the alleged threat from Page to only one other prison official.  On the next day, April 28, 2004, Klingelhut told Defendant Olson about the threat and again requested a transfer.  Klingelhut Dep. at 51.  Klingelhut also asked Defendant Ebert that same day for a transfer, but did not relate the threat as a reason for it.  Ebert Dep. at 9.  Moreover, Klingelhut never mentioned the alleged threat to his cellmate.  Neumiller Dep. at 7, 9.  Finally, the video of the assault incident itself reveals virtually no warning before Page attacked Klingelhut. Although there is no audio portion of the tape, no threatening behavior of any type by either inmate appears prior to the assault.  The video shows Defendant Sorenson, the officer on duty, assisting other inmates with canteen items and on the phone at the time of the sudden assault. Additionally, Sorenson stated that Klingelhut suggested to her earlier in the day that Page should be moved before Page was assaulted, but did not indicate that he had any issue personally with Page.  Id. at 14-16.

10

Viewing the facts in a light most favorable to Klingelhut, the subjective portion of the Eighth Amendment test is not met. First, Klingelhut has not presented sufficient evidence demonstrating that the prison officials were aware of an "excessive risk to [Klingelhut's] health or safety." Farmer, 511 U.S. at 837. The totality of the warning to prison officials consists of Klingelhut relating the alleged threat of April 27, 2004 to two prison officials to support his transfer request to a different unit. Although an official investigation of the threats was not undertaken before the assault occurred on April 30, the officials with knowledge of the threats also knew that Klingelhut had repeatedly requested a transfer before he mentioned any alleged threat. The officials did not observe secondary signs that trouble existed between Klingelhut and Page. Loscheider Dep. at 25, 27. Finally, Klingelhut did not fit the profile of an inmate under threat by staying in his cell, but rather spent his time in the common area where Page was also located. Id.; Klingelhut Dep. at 70, 72; Ebert Dep. at 19. Knowing that alleged threats are often excuses for transfer, and observing no other signs of confrontation between Page and Klingelhut, Defendants denied Klingelhut the transfer. Because Klingelhut has failed to present sufficient evidence of an Eighth Amendment violation, Defendants' Motion is granted.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 19] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/Ann D. Montgomery

ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: August 14, 2006